ASK LLP
Joseph L. Steinfeld, Jr., Esq.
2600 Eagan Woods Dr., Ste. 400
St. Paul, MN 55121
Telephone: (651) 405-9665
Fax: (651) 406-9676
E-Mail: jsteinfeld@askllp.com

Jennifer A. Christian
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 267-7342
Fax: (212) 918-3427
E-mail: jchristian@askllp.com

*Counsel to Shinsung E&G Co., Ltd.*
*(f/k/a Shinsung Solar Energy Co., Ltd.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SUNEDISON, INC., *et al.,*<br><br>                Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 16-10992 (DSJ)<br><br>(Jointly Administered) |
| SUNEDISON LITIGATION TRUST,<br><br>                Plaintiff,<br><br>v.<br><br>SHINSUNG SOLAR ENERGY CO. LTD.,<br><br>                Defendant. | Adversary Number: 18-01385 (DSJ) |

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's tax identification number, are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (NI A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML I, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEY Merger Sub Inc. (NIA); Sunflower Renewable Holdings I, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (NIA); EverStream HoldCo Fund I, LLC (9564); Buckthom Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (NI A); Rattlesnake Flat Holdings, LLC (NIA); Somerset Wind Holdings, LLC (NIA); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); SunE MN Development, LLC (8669); Terraform Private Holdings, LLC (5993); Hudson Energy Solar Corporation (3557); SunE REIT-D PR, LLC (5519); SunEdison Products, LLC (4445); SunEdison International Construction, LLC (9605); Vaughn Wind, LLC (4825); Maine Wind Holdings, LLC (1344); First Wind Energy, LLC (2171); First Wind Holdings, LLC (6257); and EchoFirst Finance Co., LLC (1607). The address of the Reorganized Debtors' corporate headquarters is Two CityPiace Drive, 2nd floor, St. Louis, MO 63141.

**ANSWER TO SECOND AMENDED COMPLAINT TO: (I) AVOID
AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§ 547, 550
AND 553(b); AND (II) DISALLOW CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

Shinsung E&G Co., Ltd. (f/k/a Shinsung Solar Energy Co., Ltd.) ("Shinsung" or
"Defendant"), by and through its undersigned counsel, files this *Answer to Second Amended
Complaint to: (I) Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 550 and 553(b); and
(II) Disallow Claims Pursuant to 11 U.S.C. § 502(d)*[2] in this adversary proceeding (the "Adversary
Proceeding") and respectfully submits:

## NATURE OF CASE

1.      Paragraph 1 of the Complaint is a characterization of this action and the relief
sought and does not require a response.

2.      Paragraph 2 of the Complaint contains a reservation of rights to which no response
is required.

## JURISDICTION AND VENUE

3.      Defendant admits the allegations in paragraph 3 of the Complaint, without limiting
Defendant's right to preserve, protect, and pursue its claims, rights, and defenses against Plaintiff
and Plaintiff's related persons or entities in other jurisdictions under applicable laws.

4.      Paragraph 4 of the Complaint contains a characterization of the action and does not
require a response.

---

[2] The *Second Amended Complaint to: (I) Avoid and Recover Transfers Pursuant to 11 U.S.C. §§
547, 550 and 553(b); and (II) Disallow Claims Pursuant to 11 U.S.C. § 502(d)* will be referred to
as the "Complaint."

5.      Defendant denies the allegations in paragraph 5 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

6.      Defendant admits the allegations in paragraph 6 of the Complaint that proceedings to determine, avoid, or recover transfers pursuant to §§ 547, 550 and 553 of the Bankruptcy Code are designated "core proceedings" under 28 U.S.C. § 157(b)(2). To the extent permitted by applicable law, Defendant does not consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Defendant admits the allegations contained in paragraph 7 of the Complaint.

8.      Defendant admits the allegations contained in paragraph 8 of the Complaint.

9.      Defendant admits the allegations contained in paragraph 9 of the Complaint.

10.     Defendant admits the allegations contained in paragraph 10 of the Complaint.

11.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint, which are therefore denied.

12.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint, which are therefore denied.

13.     Defendant admits it is a manufacturer of solar energy materials based in South Korea. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 13 of the Complaint, which are therefore denied.

14.     Defendant denies the allegations contained in paragraph 14 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

15.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint, which are therefore denied.

16.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint, which are therefore denied.

17.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint, which are therefore denied.

18.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint, which are therefore denied.

19.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint, which are therefore denied.

20.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint, which are therefore denied.

21.     Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint, which are therefore denied.

22.     Defendant admits that its headquarters is in South Korea but denies the remaining allegations in paragraph 22 of the Complaint.

23.     Defendant admits that SPS and Shinsung entered into a Solar Cell Purchase Agreement effective April 1, 2014. Defendant denies the remainder of the allegations contained in paragraph 23 of the Complaint.

24.     Defendant admits that SPS sold Shinsung wafers to be used in the manufacture of Shinsung's solar cells (wafers are the raw material used to produce solar cells). Defendant admits Shinsung would issue purchase orders to SPS for the purchase of wafers and SPS would invoice

Shinsung for the purchased wafers. Defendant admits that the parties regularly entered into netting agreements to setoff each other's open invoices.

25.     Defendant admits that it received a wire in the amount of $5,476,728.92 from OCBC. Defendant denies the remainder of the allegations contained in paragraph 25 of the Complaint.

26.     Defendant denies the allegations contained in paragraph 26 of the Complaint.

27.     Defendant denies the allegations contained in the first and second sentences of paragraph 27 of the Complaint. Defendant denies the remaining allegations in paragraph 27 because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

28.     Defendant denies the allegations contained in paragraph 28 of the Complaint.

29.     Defendant denies the allegations contained in paragraph 29 and Exhibit B of the Complaint.

30.     Defendant denies the allegations contained in paragraph 30 and Exhibit C of the Complaint.

31.     Defendant denies the allegations contained in paragraph 31 of the Complaint.

32.     Defendant denies the allegations contained in paragraph 32 of the Complaint.

33.     Defendant denies the allegations contained in paragraph 33 of the Complaint.

34.     Defendant denies the allegations contained in paragraph 34 of the Complaint.

35.     Defendant denies the allegations contained in paragraph 35 of the Complaint.

36.     Paragraph 36 of the Complaint contains a reservation of rights and remedies to which no response is required. To the extent a response is required, Defendant denies that Plaintiff is entitled to the relief sought in the Complaint.

## FIRST CAUSE OF ACTION
### (Avoidance and Recovery of Preferential Transfers)

37. Defendant repeats and re-avers its answers to all preceding paragraphs of the Complaint as if fully set forth herein.

38. Defendant denies the allegations in paragraph 38 and Exhibit A of the Complaint.

39. Defendant denies the allegations in paragraph 39 and Exhibit A of the Complaint.

40. Defendant denies the allegations in paragraph 40 of the Complaint.

41. Defendant denies the allegations in paragraph 41 of the Complaint.

42. Defendant denies the allegations in paragraph 42 of the Complaint.

43. Defendant denies the allegations in paragraph 43 of the Complaint.

44. Defendant denies the allegations in paragraph 44 of the Complaint.

45. Defendant denies the allegations in paragraph 45 of the Complaint.

46. Defendant denies the allegations in paragraph 46 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

## SECOND CAUSE OF ACTION
### (Avoidance and Recovery of Preferential Setoff under 11 U.S.C §§ 550 and 553(b))

47. Defendant repeats and re-avers its answers to all preceding paragraphs of the Complaint as if fully set forth herein.

48. Defendant denies the allegations in paragraph 48 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

49. Defendant denies the allegations contained in paragraph 49 and Exhibit B of the Complaint.

50.     Defendant denies the allegations contained in the first sentence of paragraph 50 of the Complaint. Defendant denies the allegations contained in the second sentence because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

51.     Defendant denies the allegations contained in the first and second sentences of paragraph 51 of the Complaint. Defendant denies the allegations contained in the third sentence because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

52.     Defendant denies the allegations contained in the first and second sentences of paragraph 52 of the Complaint. Defendant denies the allegations contained in the third sentence because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

53.     Defendant denies the allegations in paragraph 53 of the Complaint.

54.     Defendant denies the allegations in paragraph 54 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied. Defendant further denies that Plaintiff is entitled to recover any amount from Defendant.

## THIRD CAUSE OF ACTION
### (Disallowance of Claims)

55.     Defendant repeats and re-avers its answers to all preceding paragraphs of the Complaint as if fully set forth herein.

56.     Defendant denies the allegations in paragraph 56 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

57.     Defendant denies the allegations in paragraph 57 of the Complaint because it calls for a legal conclusion to which no response is required. To the extent a response is required, the allegations are denied.

## GENERAL DENIAL

Defendant denies every allegation contained in the Complaint that is not expressly admitted and Defendant further denies that Plaintiff is entitled to any relief or recovery whatsoever from Defendant in this action.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations of the Complaint, as and for its affirmative defenses to the allegations asserted in the Complaint, Defendant states and alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of mistake, restitution, unjust enrichment, waiver, estoppel, setoff and/or recoupment, release, unclean hands, fraud, *in pari delicto* and/or laches.

## THIRD AFFIRMATIVE DEFENSE

Pursuant to 11 U.S.C. § 547(c)(1), Plaintiff's claims for avoidance and recovery of alleged preferential transfers are barred to the extent that each of the alleged preferential transfers was intended by Defendant and the Debtor to be a contemporaneous exchange for new value provided by Defendant to the Debtor.

## FOURTH AFFIRMATIVE DEFENSE

Each of the alleged preferential transfers actually received by Defendant was executed in payment of a debt incurred by the Debtor in the ordinary course of its business and, further, each of the alleged transfers was made in the ordinary course of business between the Defendant and the Debtor and/or according to ordinary business and industry terms. Accordingly, pursuant to 11 U.S.C. § 547(c)(2), the Trustee may not avoid or recover any of the alleged preferential transfers received by the Defendant.

## FIFTH AFFIRMATIVE DEFENSE

After each of the alleged preferential transfers actually received by the Defendant was executed, Defendant provided new value to or for the benefit of the Debtor which was not secured by an otherwise unavoidable security interest, and on account of which the Debtor did not make an otherwise unavoidable transfer to or for the benefit of the Defendant. Accordingly, Plaintiff may not avoid or recover any alleged preferential transfers received by the Defendant pursuant to 11 U.S.C. § 547(c)(4).

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's prayer to recover costs and expenses of this lawsuit from the Defendant lacks any basis in law or equity and should be denied accordingly.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's prayer to recover interest from the Defendant from the date of the alleged transfers lacks any basis in law or equity and should be denied accordingly.

## EIGHTH AFFIRMATIVE DEFENSE

As a separate affirmative defense to the Complaint, and each purported cause of action thereof, Defendant, without admitting that the Complaint states a claim, submits that the Complaint and each purported cause of action thereof, is barred by the applicable statute of limitations.

## NINTH AFFIRMATIVE DEFENSE

To the extent that Defendant's contracts were assumed, or assumed and assigned, in the Debtors' bankruptcy case, Plaintiff is estopped from pursuing claims for avoidance and recovery of alleged preferential transfers as asserted in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

To the extent that the Debtors were solvent at the time they made a challenged transfer, Plaintiff may not avoid the challenged transfer under 11 U.S.C. § 547.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff lacks standing to pursue some or all of the claims asserted in the Complaint.

## TWELFTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred because they seek avoidance of transfers either not made by a Debtor or from any interest in property of a Debtor under principles of tracing and/or earmarking.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification.

## FOURTEENTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred as the Complaint seeks to avoid one or more transfers that qualify as settlement payments or transfers made by or to (or for the benefit of) a forward contract merchant.

## FIFTEENTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred as the Complaint seeks to avoid one or more transfers that is made by or to (or for the benefit of) a forward contract merchant in connection with a forward contract.

## SIXTEENTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred as the Complaint seeks to avoid one or more setoffs under a master netting agreement that provides for the exercise of rights, including the right of netting or setoff, in connection with a forward contract.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred as the Complaint seeks to avoid one or more setoffs in connection with a forward contract merchant.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Some or all of the claims in the Complaint are barred as the Complaint seeks to avoid one or more setoffs in connection with a forward contract.

## NINETEENTH AFFIRMATIVE DEFENSE

To the extent that a challenged transfer was not made on or within 90 days before the filing of the bankruptcy petition, Plaintiff may not avoid the challenged transfer under 11 U.S.C. § 547.

## RESERVATION OF RIGHTS

Defendant raises the foregoing affirmative defenses without waiver of any other defenses that may be available or determined after discovery is undertaken. Defendant gives notice that it intends to rely upon any defenses available and reserves the right to assert any additional defenses that may become available or apparent at any time during the pendency of this proceeding. Defendant further does not consent to the issuance by the Bankruptcy Court of findings of fact, conclusions of law, or final orders or judgments.

## DEMAND FOR JURY TRIAL

Defendant hereby demands trial by jury for all issues deemed so triable.

**WHEREFORE**, as to its answer to the allegations in the Complaint, Defendant respectfully requests that judgment be entered in its favor as follows:

A.      Dismissing the Complaint with prejudice in its entirety and on the merits;

B.      Denying Plaintiff's request for interest from the date of the alleged transfers and reimbursement of costs;

C.      Ordering Plaintiff to reimburse Defendant for its costs (including attorneys' fees) incurred in responding to the Complaint; and

D.      Granting such other and further relief as the Court may deem just and proper.


[*Remainder of Page Intentionally Left Blank*]

# COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure 13(a), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7013, Shinsung hereby asserts the following counterclaim (the "Counterclaim") against Plaintiff, and as the bases therefore, alleges as follows:

## PARTIES

1.      Shinsung is a manufacturer of solar energy materials headquartered in South Korea.

2.      Plaintiff is a litigation trust which alleges it is authorized, as the representative of the Debtors' estates, to pursue GUC/Litigation Trust Causes of Action, including the causes of action asserted in this Adversary Proceeding, pursuant to the Debtors' Joint Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates [Docket No. 2671], the Court's Findings of Facts, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates [Docket No. 3735], thereby approving the Plan, and the GUC/Litigation Trust Agreement.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

4.      Venue is proper under 28 U.S.C. § 1409(a) because this Counterclaim arises in and relates to the underlying Adversary Proceeding.

5.      This Adversary Proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2). To the extent that this or any other appropriate Court finds any part of this Adversary Proceeding, including this Counterclaim, to be "non-core," or to the extent that it is determined that the Bankruptcy Court does not have jurisdiction to enter a final judgment or order consistent with Article III of the United States Constitution, Shinsung does not consent at this time to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal

13

Rules of Bankruptcy Procedure and Rules 7008-1 and 7012-1 of the Local Bankruptcy Rules for the Southern District of New York; provided, however, that Shinsung reserves its right to so consent at a later date.

**FACTUAL ALLEGATIONS**

I.     **Background**

6.     Shinsung entered into a Solar Cell Purchase Agreement with SunEdison Products Singapore PTE, Ltd. ("SPS") dated as of April 1, 2014 (the "SCPA"). A copy of the agreement is attached hereto as **Exhibit A**.

7.     At the time Shinsung and SPS entered into the SCPA, many companies based in the United States sought a supply of solar cells from companies located in areas other than China and Taiwan. This was mainly because the U.S. imposed anti-dumping and countervailing duties on solar cells from China and Taiwan, so it became unreasonably costly to purchase solar cells from those countries. SunEdison, Inc. ("SunEdison"), as a US-based company, was no exception and thus its affiliate in Singapore, SPS, turned to Shinsung, a Korean company, to secure a stable supply of solar cells.

8.     According to the initial terms of the SCPA, Shinsung was to supply 145MW to 260MW solar cells to SPS per year, which was approximately 41% to 74% of Shinsung's total capacity of solar cell production – which was 350MW per year. The solar cells that Shinsung was to supply to SPS under the SCPA were converted from silicon wafers that SPS would sell to Shinsung. In other words, SPS was to sell the silicon wafers to Shinsung, and Shinsung would then use the wafers to manufacture and supply solar cells back to SPS.

9.     In 2014, the market price of wafers (the raw material used to produce solar cells) was approximately USD 1.2 per wafer. However, SPS, as part of its agreement to purchase solar cells from Shinsung, set the price of its wafers at USD 1.32, which Shinsung agreed to accept so long as the higher price for the wafers was reimbursed as part of the final sale price to SPS for the

solar cells. Shinsung, throughout its business relationship with SPS, continuously paid SPS 10-15% higher than the market price for the wafers. So long as SPS' obligations to purchase the finished solar cells for all of the wafers it sold to Shinsung were fulfilled, Shinsung would not suffer any loss from the inflated cost of the wafers.

10.     It was agreed between the parties that the sale of wafers and solar cells be a back-to-back integrated transaction. Pursuant to the SCPA, Shinsung agreed to pay for the wafers at a fixed, inflated per-wafer price, and SPS agreed to pay for the solar cells at a price level reflecting the fixed, inflated wafer price and the agreed upon conversion fee (known as the "tolling fee").

11.     Thus, SPS never requested payment *in cash* for the wafers, but instead, SPS and Shinsung would *always* set off the amount owed to each other at a certain time interval. SPS set off its payables to Shinsung with its receivables from Shinsung at the same amount and such payment terms were expressly memorialized in writing at Article 5.2 of the SCPA. There was not a single instance where SPS requested cash payment from Shinsung for the wafers.

12.     Under the transaction structure, the price of solar cells totaled the price of wafers Shinsung would pay to SPS plus Shinsung's tolling fee for the manufacture of solar cells (SCPA at Article 5.1). Shinsung's profits were generated solely from the tolling fee since the price of wafers was set off between Shinsung and SPS. SPS's obligation to purchase a certain amount of solar cells from Shinsung and accordingly pay for such solar cells, of which the price was to be determined by adding the tolling fees to the wafer price, was an essential provision of the SCPA.

13.     In 2014, after the execution of the SCPA, SPS requested that Shinsung increase its supply of solar cells. As per SPS's request, on March 12, 2015, Shinsung and SPS entered into an amendment to the SCPA ("Amendment No. 2"). A copy of Amendment No. 2 is attached hereto as **Exhibit B**. Under the initial SCPA, Shinsung was to supply and SPS was to purchase 145MW solar cells in 2014, 255MW in 2015, and 260MW in 2016. Under Amendment No. 2, SPS was to purchase 400MW solar cells in 2015, an almost 60% increase from the initially agreed volume, 402MW in 2016, and 421MW in 2017, as seen in Figure 1 below. This far exceeded Shinsung's

total manufacturing capacity at that time (350MW).



**EXHIBIT A**
**DESCRIPTION, PRICE AND LEAD TIME OF SOLAR CELLS (Continued)**

**TABLE 1**

| Shinsung | | 2015 | | | | 2016 | | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1Q | 2Q | 3Q | 4Q | 1Q | 2Q | 3Q | 4Q | 1Q | 2Q | 3Q | 4Q |
| Mono A | Average Efficiency | 19.10% | 19.20% | 19.20% | 19.40% | 19.65% | 19.70% | 19.70% | 19.80% | 19.80% | 19.80% | 19.80% | 19.85% |
| | Minimum Efficiency | 19.00% | 19.00% | 19.00% | 19.20% | 19.45% | 19.50% | 19.50% | 19.60% | 19.60% | 19.60% | 19.60% | 19.65% |
| | Tolling Fee ($/W) | $0.189 | $0.188 | $0.187 | $0.186 | $0.191 | $0.190 | $0.188 | $0.187 | $0.185 | $0.183 | $0.181 | $0.179 |
| | Volume (MW) | 85 | 75 | 75 | 90 | 72 | 72 | 77 | 78 | 79 | 79 | 79 | 79 |
| Mono B | Average Efficiency | 19.10% | 19.20% | 19.20% | 19.40% | 19.65% | 19.70% | 19.70% | 19.80% | 19.80% | 19.80% | 19.80% | 19.85% |
| | Minimum Efficiency | 19.00% | 19.00% | 19.00% | 19.20% | 19.45% | 19.50% | 19.50% | 19.60% | 19.60% | 19.60% | 19.60% | 19.65% |
| | Tolling Fee ($/W) | | $0.197 | $0.196 | $0.195 | $0.194 | $0.193 | $0.191 | $0.190 | $0.188 | $0.186 | $0.184 | $0.182 |
| | Volume (MW) | | 25 | 25 | 25 | 26 | 26 | 26 | 26 | 26 | 27 | 27 | 27 |
| Sub Total Volume (MW) | | 85 | 100 | 100 | 115 | 97 | 98 | 103 | 104 | 105 | 106 | 106 | 106 |
| Total Volume (MW) | | 400 | | | | 402 | | | | 421 | | | |

**Figure 1**. Excerpt from Amendment No. 2

14.      Under Amendment No. 2, SPS had binding purchase commitments. Exhibit A, Section 2.2 of Amendment No. 2 states: "*2.2. Quarterly Quantity, Exhibit A. Table 1.   The Parties agree that the Volumes (Mw) stated in Table 1 are binding purchase commitments for the Buyer*…".

15.      Because the quantity of solar cells requested by SPS exceeded Shinsung's manufacturing capacity at the time, Shinsung had to expand its manufacturing facilities to accommodate SPS's demand.  Because  Shinsung did not have available capital or surplus cash in its account to expand its manufacturing facilities it had to raise capital. In December 2014, Shinsung issued new shares in the amount of KRW 14 billion (approximately USD 12.7 million). In January 2015, Shinsung issued additional shares in the amount of KRW 2.1 billion (approximately USD 1.9 million). Shinsung spent this capital to expand its manufacturing capacity to 420MW. These capital expenditures were made solely to accommodate SPS's request to increase future solar cell orders.

16.      Based on  SPS's binding commitments under Amendment No. 2, Shinsung expanded its solar cell manufacturing lines at Jeungpyeong, Korea, and dedicated them to the production of solar cells according to SPS's specifications.

17.      SPS issued purchase orders for solar cells, and Shinsung supplied them accordingly.

16

As part of integrated transactions, Shinsung and SPS executed netting agreements to offset outstanding invoices, including:

a.  Payment Agreement dated July 25, 2014, in the amount of $1,238,688;

b.  Payment Agreement dated September 25, 2014, in the amount of $3,730,320;

c.  Payment Agreement dated October 25, 2014, in the amount of $2,814,768;

d.  Payment Agreement dated November 25, 2014, in the amount of $3,510,012;

e.  Payment Agreement dated March 31, 2015, in the amount of $10,033,445.89;

f.  Payment Agreement dated June 24, 2015, in the amount of $15,972,525.36;

g.  Payment Agreement dated October 31, 2015, in the amount of $23,640,005.64;

h.  Payment Agreement dated February 19, 2016, in the amount of $18,922,540.96 (the "February 2016 Payment Agreement");[3] and

i.  Payment Agreement dated March 31, 2016, in the amount of $18,918,938.44 (the "March 2016 Payment Agreement").[4]

18.     The netting agreements explicitly state that, *"under the supply agreement, SunEdison would sell certain raw materials to Company that would be consumed by Company in the manufacture of the products for SunEdison and would invoice company for such raw materials." See, e.g.,* February 2016 Payment Agreement and March 2016 Payment Agreement (emphasis added).

19.     On December 28, 2015, SPS sent a letter to Shinsung stating that there may be some delays in payment but affirmed that it would pay its outstanding amount in full. This was not the first time that SPS made delayed payments and Shinsung had no reason to doubt that any delayed amount would be subsequently set off against Shinsung's payables to SPS.

20.     A letter from SPS to Shinsung, dated December 28, 2015, states: *"As discussed,*

---

[3] A copy of the February 2016 Payment Agreement is attached hereto as **Exhibit C**.

[4] A copy of the March 2016 Payment Agreement is attached hereto as **Exhibit D**.

SunEdison Products Singapore Ltd. ("SPS") will experience some delays in the planned schedule of payment to Shinsung Solar Energy Co., Ltd. ("Shinsung") …

> As discussed and agreed, SPS agrees to make payment of the Invoiced Amounts in full, and Shinsung agrees to accept such payment in full satisfaction of the Invoiced Amounts, according to the following calendar:
>
> - $5,500,000.00 on or before Thursday, January 21, 2016
> - $1,486,948.59 on or before Thursday, January 28, 2016"[5]

21.     Shinsung believed that SPS would abide by its purchase obligations through the end of 2017 and continued to purchase wafers from SPS up until March 2016. Shinsung even raised further capital, through a new share issue, to invest further in the solar cell manufacturing facilities. SPS was well aware that Shinsung expanded its manufacturing facilities in order to accommodate SPS's demand for an increased supply of solar cells as the expansion of the manufacturing facilities was specifically requested by SPS.

22.     However, SPS stopped issuing purchase orders from January 2016, with the exception of one dated April 15, 2016 for just 200 solar cells. This resulted in a serious imbalance in the supply of wafers that Shinsung had purchased from SPS and for which SPS did not issue corresponding purchase orders for the finished solar cells. It also resulted in significant lost profits and ultimately to the shutdown of the manufacturing facilities that had been dedicated to manufacturing SPS's solar cells.

23.     As a result of SPS's failure to meet its contractual commitment to purchase solar cells pursuant to Amendment No. 2, Shinsung suffered lost profits in the amount of USD 37,101,300 (approximately 10,549,000 in 2016 and USD 26,552,000 in 2017).   In addition, Shinsung had to dismantle the expanded manufacturing facilities designed specifically for SPS at

---

[5] A copy of the letter from SPS to Shinsung dated December 28, 2015 is attached hereto as **Exhibit E**.

a cost of USD 9,853,500. In total, due to SPS's breach of its commitment to purchase solar cells, Shinsung suffered damages in the amount of USD 46,954,800.

## II.    The SCPA Falls Under The Safe Harbor Provisions Of The Code

24.    Shinsung and SPS entered into the SCPA to buy and sell silicon wafers and solar cells.

25.    Under the terms of the SCPA, Shinsung was required to purchase silicon wafers from SPS to be used in the manufacturing of solar cells. Pursuant to Exhibit D-1 of the SCPA, purchasing wafers from any manufacturer other than SPS would be deemed a material change and require SPS's approval.

26.    Both the SCPA (and Amendment No. 2) and each subsequent Purchase Order were executed more than two days in advance of Shinsung delivering the solar cells to SPS.

27.    The SCPA was entered into on April 1, 2014, and Amendment No. 2 was entered into on March 12, 2015, both well in advance of the delivery dates for the solar cells.

28.    SPS would provide its Purchase Orders to Shinsung monthly, on or before the tenth calendar day of each month.

29.    The Purchase Order lead time would be four weeks after SPS delivered its Purchase Order to Shinsung.

30.    Shinsung was required to deliver the solar cells in accordance with the delivery terms set forth in each Purchase Order.

31.    Each Purchase Order specified the cells being ordered, price, quantity, delivery destination, and delivery date, which terms were all agreed upon in advance of the Purchase Order being issued, and once the Purchase Order was received by Shinsung, the maturity/delivery date would be at least four weeks later. The price listed on the Purchase Order included the pre-negotiated Wafer Material Price.

32.    Each Purchase Order also stated that it was being made pursuant to the SCPA and incorporated by reference the terms of the SCPA.

33.     The solar cells delivered under the SCPA were delivered more than two days after the SCPA was executed and more than two days after each Purchase Order was received (which Purchase Orders were incorporated into and made part of the SCPA for "all purposes").

34.     The debtor is the largest global renewable-energy development company in the world. *See First Day Declaration of Patrick M. Cook Pursuant to Local Bankruptcy Rule 1007-2 And In Support Of Chapter 11 Petitions And First Day Pleadings* [Docket No. 4] at ¶10. The debtor develops, finances, installs, owns, and operates renewable energy power plants, while also serving as a renewable energy asset manager. *Id.* The Renewable Energy Development Segment includes the Solar Materials Business Unit (which SPS is a part of) which subcontracts the assembly of solar modules to sell to third-party customers. *Id.* at ¶11.

35.     SPS served as a "middle-man" between Shinsung and third party purchasers of solar cells by purchasing solar cells from Shinsung and then reselling the solar cells to third parties for profit.  Sample invoices are attached hereto as **Exhibit F**.

36.     Shinsung was not the end user of the wafers nor the solar cells, but rather a middleman in the business of buying and selling raw materials with the goal of supplying solar energy to end users (customers of SPS or the third parties SPS sold to).

37.     Solar cells and wafers are not traded on an exchange or regulated by a board of trade.

### III.     SPS Files For Bankruptcy And Shinsung Terminates The SCPA Under The Safe Harbor Provisions Of The Code

38.     On April 11, 2016, Woongjin Energy Co. Ltd. ("Woongjin") filed a petition for Provisional Attachment Order in South Korea enjoining Shinsung from paying certain receivables to SPS. On April 18, 2016, The Seoul Central District Court granted the provisional attachment (the "Provisional Attachment Order") in the amount of $4,519,247.19 (the "Seized Claim").

39.     On April 21, 2016 (the "Petition Date"), SPS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Code") in the United States Bankruptcy Court

for the Southern District of New York (the "Court").

40.     As of the Petition Date, the SCPA was an executory contract as there were continuing obligations for both parties that remained under the agreement (the supply of wafers and supply of solar cells), which ran through the end of 2017.

41.     A few weeks after the Petition Date, on May 2, 2016, Shinsung delivered a notice of termination of the SCPA (the "Termination Notice") to SPS. A copy of the Termination Notice is attached hereto as **Exhibit G**.

42.     The Termination Notice provides:

> Pursuant to Section 7 (Termination For Cause) of the [SCPA], which specifies that the [SCPA] may be terminated for cause by either Party if the other Party files a voluntary petition in bankruptcy, we hereby terminate the [SCPA] by giving this notice of termination.

43.     Shinsung also expressly states in the Termination Notice that it had faithfully complied with the provisions of the SCPA.

44.     SPS did not dispute the Termination Notice – neither the termination itself nor the statement that Shinsung had remained in compliance.

45.     SPS did not send any notice to Shinsung nor file any pleadings with the Court alleging that Shinsung had violated the automatic stay provisions of the Code by delivering the Termination Notice to SPS.

46.     SPS was represented by Skadden, Arps, Slate, Meagher & Flom LLP and Togut, Segal & Segal LLP, highly sophisticated bankruptcy counsel, in its chapter 11 case and if such counsel believed Shinsung had violated the automatic stay, they would have enforced SPS's rights and remedies. In fact, the Debtors did just that (a mere three months after Shinsung delivered its Termination Notice to SPS) against Trina Solar, Inc. ("Trina") in connection with its Module Supply Agreement with SPS. On August 15, 2016, the Debtors filed a *Motion for an Order Pursuant to Bankruptcy Code Sections 105(a), 362, and 365, Bankruptcy Rules 4001, 6004, 9006, 9014, and 9020, and Local Bankruptcy Rules 9077-1 and 9006-1(b) (I) Compelling Performance*

*of Trina Solar, Inc.'s Obligations Under Executory Contracts, (II) Enforcing the Automatic Stay, (III) Compelling Compliance With the Consent Order, and (IV) For Civil Contempt Sanctions* [Docket No. 994] (the "Stay Violation Motion").

47.     Under the Stay Violation Motion, the Debtors sought sanctions against Trina for violating the automatic stay by failing to perform under their executory contract with the Debtors. Stay Violation Motion, ¶40-41. The Debtors had previously sought and obtained a Consent Order prohibiting Trina from taking any actions to violate the automatic stay and ordering Trina to comply with its obligations under its Module Supply Agreement with SPS. *Id.* at ¶28.

48.     The Debtors argued in the Stay Violation Motion that a counterparty "exercising a terminable-at-will provision is not permitted without relief from the stay," *id.* at ¶34, and that an executory contract remains in effect and creditors are bound to honor it, until it is assumed or rejected. *Id.* at ¶26.

49.     The Debtors further argued that a debtor in possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is  the  life blood of its reorganization. *Id.* (citing, *Lehman Bros. Holdings Inc.,* No. 08-13555 (JMP), 2009 WL 6057286 (Bankr. S.D.N.Y. Sept. 17, 2009) for the proposition that failing to perform under an executory agreement is a violation of the automatic stay.)

50.     Despite being equipped with this knowledge and successfully receiving a Consent Order requiring Trina's continued performance under its executory contract, no such attempts were ever made by SPS or any of the Debtors to challenge Shinsung's Termination Notice.

51.     SPS did not challenge the Termination Notice because, unlike the executory contract in Trina, the SCPA fell under the safe harbor provisions of the Code, and, therefore, the SCPA could be terminated post-petition by Shinsung without violating the automatic stay under 11 U.S.C. § 362(b)(6).

52.     Six months after Shinsung delivered the Termination Notice to SPS, SPS demanded that Shinsung turn over $5,441,143.97 that SPS was owed as of the Petition Date for wafers

Shinsung had purchased from SPS prior to the Petition Date. Such demand was premised on the fact that the SCPA was terminated and thus no longer performed.

53.     However, Woongjin had obtained the Provisional Attachment Order over the Seized Claim from the Korean court, and, therefore, Shinsung could not turn over the Seized Claim to SPS. Shinsung was permitted to pay SPS only up to the net difference between the turnover demand of $5,441,143.97, representing the total payable amount owed to SPS by Shinsung, and the Seized Claim of $4,519,247.19. And such difference was in the amount of $921,896.78 (the "Remaining Claim").

54.     SPS also owed Shinsung $28,613.70 on account of unpaid invoices for solar cells supplied to SPS by Shinsung prior to the Petition Date.

55.     On March 22, 2017, Shinsung and SPS entered into a Set-Off Agreement (the "Post-Petition Set-Off Agreement") pursuant to which Shinsung and SPS set-off the Shinsung's claim of $28,613.70 from SPS's Remaining Claim and Shinsung was to pay SPS $893,283.08. A copy of the Post-Petition Set-Off Agreement is attached hereto as **Exhibit H**.

56.     On April 4, 2017, Shinsung transferred $893,283.08 to SPS pursuant to the terms of the Post-Petition Set-Off Agreement (the "Post-Petition Payment"). A copy of the transaction statement is attached hereto as **Exhibit I.**

57.     Negotiations took place over several months as to Woongjin's cancellation and release of the Provisional Attachment Order, settlement of accounts, and debt repayments.

58.     On November 27, 2017, Shinsung, SPS and Woongjin entered into an agreement (the "Three-Party Agreement") as to the cancellation and release of the Provisional Attachment Order and the payment of receivables. A copy of the Three-Party Agreement is attached hereto as **Exhibit J**.

59.     On November 28, 2017, in accordance with the Three-Party Agreement, an application for cancellation and release of the Provisional Attachment Order was filed. The cancellation and release then took place on November 29, 2017.

60.     On December 1, 2017, Shinsung made a payment of $375,000 to Woongjin and a payment of $2,072,123.60 to SPS. On December 20, 2017, Shinsung made another payment to SPS in the amount of $2,072,123.59 to satisfy all of the Seized Claim (i.e., $4,519,247.19) in accordance with the Three-Party Agreement.

61.     The Debtors did not seek Court approval of the Post-Petition Set-Off Agreement or the Three-Party Agreement and the setoff was accomplished without the Debtors providing notice to creditors.

62.     As a result of the Termination Notice, the Post-Petition Set-off Agreement, the Post-Petition Payment, the Three-Party Agreement, and the payment of the Seized Claim, SPS and Shinsung's relationship was fully and finally settled by December 2017.

63.     After December 2017, SPS provided no indication to Shinsung that the SCPA continued in effect.

64.     SPS never challenged Shinsung's post-petition termination of the SCPA in Court or otherwise.

### IV.     The Debtors' Bankruptcy Plan Automatically Rejects Executory Contracts

65.     To the extent it is determined that the SCPA does not fall within the safe harbor provisions of the Code and the SCPA could not have been terminated by Shinsung post-petition, Shinsung has claims against SPS in the amount of $52,395,943.97 on account of its rejection damages claims totaling $46,954,800, and the Post-Petition Payment and Seized Claim which together totaled $5,441,143.97 and which were improperly paid as SPS had not yet made a determination as to whether it would assume or reject the SCPA.

66.     On March 28, 2017, SPS and its affiliated debtor entities (collectively, the "Debtors") filed their Joint Plan of Reorganization [Bankr. Dkt. No. 2671] (as amended from time to time, the "Plan").

67.     On July 28, 2017, the Court entered its Findings of Facts, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and its

Debtor Affiliates [Bankr. Dkt. No. 3735], approving the Plan and the GUC/Litigation Trust Agreement (the "<u>Litigation Trust Agreement</u>").

68.    On December 29, 2017, the Plan became effective [Bankr. Dkt. No. 4495] (the "<u>Effective Date</u>").

69.    Section 8.1(a) of the Plan provides for the automatic rejection of certain executory contracts and unexpired leases:

**8.1 Rejection of Executory Contracts and Unexpired Leases**.

(a) **Automatic Rejection**. Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" contained in Exhibit 8.1 of the Plan; (b) has been previously assumed by the Debtors by Final Order of the Bankruptcy Court or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (c) is the subject of a motion to assume or reject pending as of the Effective Date; (d) is an Executory Contract related to any Intercompany Claim; or (e) is otherwise assumed pursuant to the terms herein.

70.    The SCPA did not fall under any of the exceptions in Section 8.1(a) of the Plan and to the extent the termination of the SCPA was void, the SCPA was, therefore, automatically rejected on the Effective Date pursuant to the terms of the Plan. Under such circumstances, (a) Shinsung has rejection damages claims in the amount of $46,954.800 that are deemed to have arisen prior to the Petition Date; and (b) the Debtors wrongfully induced Shinsung to make the Post-Petition Payment and payment on the Seized Claim by leading Shinsung to believe they had accepted the termination of the SCPA and the relationship between the parties was over.

## V. Setoff and Recoupment Are Permitted Defenses To This Adversary Proceeding Under The Terms Of The Confirmation Order

71. Section 10.12 of the Plan provides:

**10.12 Setoffs.** Except as otherwise expressly provided for in the Plan and except with respect to any Original DIP Facility Claims, Replacement DIP Facility Claims, Second Lien Claim, Convertible Senior Notes Claim, and any distribution on account thereof, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise**.**

72. Section 11.12 of the Plan provides:

**11.12 Recoupment.** In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

73. Paragraph 34 of the Confirmation Order provides:

Notwithstanding anything to the contrary in this Order, *the Plan*, or any Plan Supplement, nothing in the schedule of Retained Causes of Action (Exhibit 6.20 of the Plan Supplement) [Docket No. 3522] shall preclude and [sic] party from asserting any available defense to any retained cause of action asserted by or on behalf of the Debtors. [emphasis added]

A copy of Exhibit 6.20 of the Plan Supplement is attached hereto as **Exhibit K.**

## **COUNTERCLAIM COUNT 1:**

## **DECLARATION THAT THE SAFE HARBOR PROVISIONS OF THE CODE PROHIBIT THE TRUSTEE FROM RECOVERING UNDER 11 U.S.C. §§ 547 AND 553(b)(1) IN THIS ADVERSARY PROCEEDING**

74.     The Bankruptcy Code contains numerous safe harbor provisions that, taken together, are designed to neutralize the impact of a bankruptcy filing upon non-debtor counterparties so that the underlying policies of the Code do not disrupt the securities and commodities markets. For example, certain safe harbor provisions:

- Permit the exercise of set off rights under securities contracts, commodities contracts, forward contracts, repurchase contracts, swap agreements, master netting agreements or similar instruments;

- Permit the exercise of contractual rights to liquidate, terminate or accelerate such contracts, and

- Exempt prepetition settlement payments, margin payments and certain transfers made in connection with such contracts/instruments from avoidance as a preference or a constructive fraudulent conveyance and recovery under setoff theories.

75.     Section 546(e) of the Code provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

76.     Section 553(b)(1) of the Code limits the trustee's right to recover certain prepetition setoffs. Such exemptions include those described in section 362(b)(6) [forward contract merchant], 362(b)(7) [repo participant], 362(b)(17) [swap participant], 362(b)(27) [master netting agreement participant], 555 [securities contract], 556 [forward contract], 559 [repo agreement], 560 [swap], and 561 [master netting agreement]. 11 U.S.C. § 553(b)(1).

77.     Each of the exceptions described in Section 553(b)(1) pertain to certain contracts that Congress specifically immunized from the impact of a chapter 11 bankruptcy filing (forward contracts, repurchase agreements, swaps, master netting agreements, etc.), as set forth above. Each of the Code sections referenced in the carveout of Section 553(b)(1) allows the parties under these types of contracts to proceed without the interference of the automatic stay or Code provisions that invalidate ipso facto clauses in contracts. To the extent the setoff provisions in the February 2016 Payment Agreement and March 2016 Payment Agreement are exempted from the applicability of Section 553(b)(1), they would not be subject to the "improvement in position" test set forth therein.

78.     A contract meets the definition of "forward contract" under 11 U.S.C. § 101(25) if the contract: (i) was a contract for the sale of a commodity or similar good, service, or right; (ii) with a delivery date more than two days after execution; (iii) by or to a forward contract merchant; and (iv) that is not otherwise subject to the rules of a board of trade.

79.     Shinsung and SPS entered into a contract – the SCPA - to buy and sell silicon wafers and solar cells. Pursuant to the SCPA, SPS sold silicon wafers to Shinsung at a stated price and Shinsung used those wafers to manufacture solar cells that it then sold back to SPS. Both solar cells and wafers are "goods" and thus qualify as "commodities" and/or "similar goods" as defined in 7 U.S.C. § 1(a)(9) and 11 U.S.C. § 101(25), respectively.

80.     The term "commodity" for purposes of section 546(e) has the same meaning ascribed to it in the Commodity Exchange Act. See 11 U.S.C. § 761(a). As such, commodity means: "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow,

28

cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1(a)(9).

81.     Even if the Court were to find that a solar cell or wafer is not a "commodity," the SCPA still fits within the definition of a "forward contract" under 11 U.S.C. § 101(25) which states that a "forward contract" is:

> [A] contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase transaction, reverse repurchase transaction, consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement

82.     Both the SCPA (and Amendment No. 2) and each subsequent Purchase Order were executed more than two days in advance of Shinsung delivering the solar cells to SPS, thus satisfying the two-day maturity date requirement of a "forward contract." The SCPA was entered into on April 1, 2014, and Amendment Number Two (2) was entered into on March 12, 2015. Both agreements were executed well in advance of the delivery dates for the solar cells.

83.     Under the terms of the SCPA, each purchase and sale of solar cells was to be initiated by a Purchase Order. ¶3, SCPA. SPS would provide its Purchase Orders to Shinsung monthly, on or before the tenth calendar day of each month. *Id.* Unless otherwise agreed to in writing by the parties, the Purchase Order lead time would be four weeks after SPS delivered its Purchase Order to Shinsung. *Id.* Shinsung was required to deliver the solar cells in accordance with the delivery terms set forth in each Purchase Order. ¶4, SCPA. Each Purchase Order specified

the cells being ordered, price, quantity, delivery destination, and delivery date. ¶3.1, SCPA. These terms were all agreed upon in advance of the Purchase Order being issued, and once the Purchase Order was received by Shinsung, the maturity/delivery date would be at least four weeks later.

84.     Each Purchase Order also stated that it was being made pursuant to the SCPA and incorporated by reference the terms of the SCPA. *Id.* Likewise, the integration provision of the SCPA states, "all Purchase Orders issued by Buyer (SPS), and all Purchase Order Acknowledgements issued by Supplier [Shinsung], during the Terms of the Agreement are hereby incorporated into this Agreement and made part of this Agreement for all purposes." ¶3.3, SCPA. Thus, the SCPA, combined with the Purchase Orders, specified the type, price, quantity, delivery destination, and delivery date of the cells more than two days in advance of maturity.

85.     The SCPA satisfies the delivery date/maturity requirement because the solar cells were delivered more than two days after the SCPA was executed and more than two days after each Purchase Order was received (which Purchase Orders were incorporated into and made part of the SCPA for "all purposes").

86.     Under the plain language of section 546(e), only one of the contracting parties needs to be a "forward contract merchant." The term "forward contract merchant" means "a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101(26).

87.     The debtor is a "forward contract merchant" as it is in the business of dealing in renewable energy, and in particular solar cells. The debtor is the largest global renewable-energy development company in the world. *See First Day Declaration of Patrick M Cook Pursuant to Local Bankruptcy Rule 1007-2 And In Support Of Chapter 11 Petitions And First Day Pleadings* [Docket No. 4] at ¶10. The debtor develops, finances, installs, owns, and operates renewable energy power plants, while also serving as a renewable energy asset manager. *Id.* The Renewable

Energy Development Segment includes the Solar Materials Business Unit (which SPS is a part of) which subcontracts the assembly of solar modules to sell to third-party customers. *Id.* at ¶11.

88.     Specifically, SPS served as a "middle-man" between Shinsung and third party purchasers of solar cells. SPS served as a middleman by purchasing solar cells from Shinsung and then reselling the solar cells to third parties, such as Solar Park Korea Co., Ltd., for profit. This is corroborated by paragraph two of the SCPA which provides "[s]upplier acknowledges that: (i) Buyer may resell the solar cells...or (ii) integrate the solar cells purchased hereunder with other products developed by Buyer or developed by third parties on Buyer's behalf." ¶2, *SCPA. See also Sample Invoices annexed hereto as Exhibit F.* Because the debtor purchased solar cells and resold them to third parties, as well as regularly engaged in forward contracts involving energy and raw materials, it is a "forward contract merchant."

89.     Shinsung is also a "forward contract merchant" because it regularly engaged in the forward contract trade by purchasing wafers from SPS pursuant to the SCPA at an above market fixed price and then using such wafers to manufacture solar cells that it then sold to SPS, who sold them to third parties. Shinsung was not the end user of the wafers nor the solar cells, but rather a middleman in the business of buying silicon wafers and selling solar cells through SPS to end users (customers of SPS or the third parties SPS sold to).

90.     "Forward contracts" are contracts for the future purchase or sale of commodities that are not subject to the rules of a contract market or board of trade. Conversely, the term "commodity contract" encompasses purchases and sales of commodities for future delivery on, or subject to the rules of, a contract market or board of trade, and leverage transactions. Because solar cells and wafers are not traded on an exchange or regulated by a board of trade, contracts for the future purchase or sale of solar cells are "forward contracts" and not "commodity contracts."

91.     The alleged preference payment was a "settlement payment" made by a "forward contract merchant" (SPS). Section 546(e) expressly states that "the trustee may not avoid a transfer that is…a settlement payment, as defined in section 101 or 741 of this title, made by or to (or for

the benefit of) a … forward contract merchant." 11 U.S.C. § 546(e). The term "settlement payment" means, "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A).

92.     The February 2016 and March 2016 Payment Agreements are "Master Netting Agreements." The Code defines a "master netting agreement" as:

> [A]n agreement providing for the exercise of rights, including rights of netting, setoff, liquidation, termination, acceleration, or close out, under or in connection with one or more contracts that are described in any one or more of paragraphs (1) through (5) of section 561(a), or any security agreement or arrangement or other credit enhancement related to one or more of the foregoing, including any guarantee or reimbursement obligation related to 1 or more of the foregoing. . 11 U.S.C. §§ 101(38A)(A)

93.     The Code also defines a "master netting agreement participant" as:

> [A]n entity that, at any time before the date of filing of the petition, is a party to an outstanding master netting agreement with the debtor. 11 U.S.C. §§ 101(38B).

94.     The February 2016 and March 2016 Payment Agreements fit within the definition of "master netting agreement" as they are agreements that provide for the exercise of rights, including the right of netting or offsetting in connection with a forward contract (§ 561(3)) – the SCPA.

95.     Based on the foregoing Shinsung requests that the Court enter an order declaring that the "safe harbor" provisions of the Bankruptcy Code prohibit the Trustee from recovering under 11 U.S.C. §§ 547 and 553(b)(1) in this Adversary Proceeding.

## COUNTERCLAIM COUNT 2:

## SHINSUNG IS ENTITLED TO EXERCISE
## ITS SETOFF AND/OR RECOUPMENT RIGHTS

96.     To the extent that the Court finds that the safe harbor provisions of the Code do not prohibit the Trustee from recovering under 11 U.S.C. §§ 547 and 553(b)(a) in this Adversary Proceeding, Shinsung requests that the Court enter an order allowing Shinsung to exercise its setoff and/or recoupment rights.

## SETOFF

97.     Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.' " *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 18 (1995) (citation omitted). Bankruptcy law, except as provided in 11 U.S.C. §§ 362 and 363 of the Bankruptcy Code, "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case ... against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a). Accordingly, § 553 of the Bankruptcy Code preserves in bankruptcy whatever rights of setoff a party may have under applicable non-bankruptcy law. *See, e.g., Strumpf,* 516 U.S. at 18.

98.     Under § 553 of the Bankruptcy Code, whatever claim or right of setoff the creditor had under non-bankruptcy law will be preserved in bankruptcy. 11 U.S.C. § 553(a).

99.     Section 553(a) preserves a creditor's claim of setoff where: (1) the debt owed to the debtor arose prior to the filing of the bankruptcy case; (2) the creditor holds a claim against the debtor that arose prior to the filing of the bankruptcy case; (3) the claim and debt are mutual obligations; and (4) the claim and debt are valid and enforceable. *See In re Garden Ridge Corp.,* 338 B.R. 627, 633 (Bankr. D. Del. 2006) (citing *In re APF Co.,* 264 B.R. 344, 354 (Bankr. D. Del. 2001)).

100.     Shinsung has a valid right of setoff against any amounts owed in connection with this Adversary Proceeding.

101.     The laws of Singapore govern the SCPA and Singapore recognizes legal set-off, equitable set-off and set-off by judgment.

102.     The necessary factors under § 553(a) are satisfied in that both Shinsung and SPS' obligations arose before the Petition Date, are mutual obligations, and are each valid and enforceable. Therefore, under the parties' contractual agreement, the laws of Singapore, and the Bankruptcy Code, Shinsung should be permitted to set off its claims against SPS against any amounts the Court determines are owed by Shinsung in connection with this Adversary Proceeding.

## RECOUPMENT

103.     Recoupment and setoff are distinct legal concepts, though the distinctions between the two are often subtle. Collier on Bankruptcy, 15th ed. Rev. ¶ 553.10 (2006). Recoupment, unlike setoff, allows a creditor to net obligations arising from the same transaction or occurrence regardless of whether such obligations accrue prepetition or postpetition. Further, "while setoff, in effect, elevates an unsecured claim to a secured status, recoupment allows the creditor to assert that mutual claims extinguish one another." *In re Photo Mechanical Services, Inc.*, 179 B.R. 604, 612 (Bankr. D. Minn. 1995) (citing *Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir. 1984)); *see also In re Malinowski*, 156 F.3d 131 (2d Cir. 1998).

104.     Recoupment applies to define the obligation in question, rather than to establish or enforce a separate debt. *See In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998); *In re Franklin Indus. Complex, Inc*., 541 B.R. 14, 37 (Bankr. N.D.N.Y. 2015); *In re Delta Air Lines*, 359 B.R. 454, 466-67 (Bankr. S.D.N.Y. 2006). The foregoing decisions are in concert with the recognition by the United States Supreme Court, in *Reiter v. Cooper*, that "recoupment permits a determination of the 'just and proper liability on the main issue' and involves 'no element of preference.'" *Reiter v. Cooper,* 507 U.S. 258, 265 n2, 113 S. Ct. 1213, 1218 n2 (1993) (citing 4 Collier on Bankruptcy

¶ 553.03, p. 553-17 (15th ed. 1991).

105. The United States Supreme Court has stated that, for the purposes of whether obligations arise out of the same transaction in the context of recoupment, the term 'transaction' is of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371 (1926). Applying this standard, courts have permitted a variety of obligations to be recouped against each other, requiring only sufficient interconnection such that it would be unjust to require one party to perform while excusing the other party from its performance. Collier on Bankruptcy, 15th ed. rev. ¶ 553.10[1] (2006). In contrast, the Second Circuit has, in the past, applied a more restrictive "integrated transaction test." See, e.g., *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138 (2d Cir. 2002). Under the "integrated transaction test", the obligations in question must "arise out of a single *integrated transaction* so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations." *Id.* at 147 (quoting *In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998)) (citations omitted).

106. Irrespective of whether the "logical relationship test" or "integrated transaction test" is applied, the obligations at issue arise out of the same transaction for recoupment purposes. Therefore, Shinsung is entitled to recoup any amount SPS owed to Shinsung against any amount Shinsung owed to SPS so long as the obligations to pay such amounts arose from the transactions that transpired under the SCPA (as amended).

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, as to its Counterclaim as alleged herein, Shinsung respectfully prays for the following relief:

A.    For an order declaring that the safe harbor provisions of the Code (§§546(e) and 555, 556, 559, 560, 561) prohibit the Trustee from recovering under 11 U.S.C. §§ 547 and 553(b)(1) in this Adversary Proceeding.

B.    Alternatively, to the extent the Court finds that the SCPA (as amended) is not a forward contract or settlement agreement or master netting agreement and, thus, the safe harbor provisions of the Code do not prohibit the Trustee from recovering under 11 U.S.C. §§ 547 and 553(b)(1) in this Adversary Proceeding, authorizing Shinsung to setoff or recoup $52,395,943.97, the total amount of its damages claims ($46,954,800) and the Post-Petition Set-off Payment made under the Post-Petition Setoff Agreement and payments made regarding the Seized Claim ($5,441,143.97), against any amounts the Court may find that Shinsung owes Plaintiff in this Adversary Proceeding;

C.    For costs of suit and attorneys' fees, to the extent permitted by law; and

D.    For such other and further relief as the Court may deem just and proper.

Dated: April 10, 2023                    RESPECTFULLY SUBMITTED,

                                         ASK LLP

                                         By: */s/ Jennifer A. Christian*
                                         Joseph L. Steinfeld, Esq.
                                         2600 Eagan Woods Drive, Suite 400
                                         St. Paul, MN 55121
                                         Tel: 651-289-3850
                                         Fax: 651-406-9676
                                         E-mail: jsteinfeld@askllp.com

                                         Jennifer A. Christian, Esq.
                                         60 East 42nd Street, 46th Floor
                                         New York, NY 10165
                                         Tel: 212-528-0156
                                         Fax: 212-918-3427
                                         E-mail: jchristian@askllp.com

                                         *Counsel to Shinsung E&G Co., Ltd. (f/k/a Shinsung*
                                         *Solar Energy Co., Ltd.)*