**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>**NOT FOR PUBLICATION**</u>

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| SUNEDISON, INC., *et al.,* | : | Case No. 16-10992 (DSJ) |
|  | : |  |
| Reorganized Debtors.[1] | : | (Jointly Administered) |
|  | : |  |
| SUNEDISON LITIGATION TRUST, | : |  |
|  | : | Adv. Pro. No. 18-01385 (DSJ) |
| Plaintiff, | : |  |
|  | : |  |
| – against – | : |  |
|  | : |  |
| SHINSUNG E&G CO., LTD. (F/K/A | : |  |
| SHINSUNG SOLAR ENERGY CO. LTD.), | : |  |
|  | : |  |
| Defendant. | : |  |

<u>**MEMORANDUM OPINION AND ORDER RESOLVING**</u>
<u>**PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS AND**</u>
<u>**STRIKE CERTAIN AFFIRMATIVE DEFENSES**</u>

---

[1]     The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); and SunE MN Development, LLC (8669).  The address of the Reorganized Debtors' corporate headquarters is Two CityPlace Drive, 2nd floor, St. Louis, MO 63141.

**A P P E A R A N C E S :**

**COLE SCHOTZ P.C.**
*Counsel to the SunEdison Litigation Trust*
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
By:    Daniel F.X. Geoghan, Esq.
       Mark Tsukerman, Esq.

**ASK LLP**
*Counsel to the Defendant, Shinsung E&G Co., Ltd. (f/k/a/ Shinsung Solar Energy Co. Ltd.)*
60 East 42nd Street, 46th Floor
New York, NY 10165
By:    Jennifer A. Christian, Esq.

**ASK LLP**
*Counsel to the Defendant, Shinsung E&G Co., Ltd. (f/k/a/ Shinsung Solar Energy Co. Ltd.)*
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
By:    Joseph L. Steinfeld, Jr., Esq.
       Richard J. Reding, Esq.

Before the Court is Plaintiff SunEdison Litigation Trust's ("**Plaintiff**" or the "**Trust**")
motion to dismiss Defendant Shinsung E&G Co., LTD's ("**Defendant**" or "**Shinsung**")
counterclaims and strike certain affirmative defenses (the "**Motion**").    In this adversary
proceeding, Plaintiff, a litigation trust that was assigned certain estate causes of action pursuant to
the confirmed Chapter 11 plan in the above-captioned bankruptcy case (the "**Plan**"), is suing
Defendant, a manufacturer of solar energy materials, to avoid and recover certain alleged
preferential transfers and setoffs.  [*E.g.*, ECF No. 23 at 1].[2]  Defendant, in turn, is countersuing for
a declaratory judgment that the "safe harbor" provisions of the Bankruptcy Code bar Plaintiff's
claims (the "**First Counterclaim**"), and, in the alternative, for an offset of any liability Defendant
may face through setoff and/or recoupment based on a disputed breach of contract claim (the

---

[2] Unless otherwise specified, references to the Case Management/Electronic Case Filing ("**ECF**") docket are to the above-captioned adversary proceeding, and references to the "Main ECF" are to the above-captioned main bankruptcy proceeding.  Whenever possible, this Decision cites a document's underlying pagination in the form "ECF No. __ at __."  When that is not possible because of a document's formatting, this Decision cites the page number in the ECF-stamped banner at the top of the page, in the form "ECF No. __ at __ of __."  At times, the Decision also cites paragraph or section numbers.

2

"**Second Counterclaim**"). [*E.g.*, *id.*]. Defendant also has asserted numerous affirmative defenses, including one which is at least partially based on the same doctrines of setoff and/or recoupment (the "**Second Affirmative Defense**"). [*E.g.*, *id.*].

Plaintiff's present Motion asks the Court to dismiss both of Defendant's counterclaims with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and to strike Defendant's Second Affirmative Defense to the extent it is based on the doctrines of setoff and/or recoupment pursuant to Rule 12(f). [*Id.* at 2]. For the reasons that follow, the Motion is denied in part to the extent it seeks to dismiss Defendant's First Counterclaim and strike Defendant's Second Affirmative Defense, and granted in part to the extent it seeks to dismiss Defendant's Second Counterclaim.

## BACKGROUND

## I.    Materials Considered in Deciding the Motion

Unless otherwise noted, for purposes of this Motion, the Court takes as true all well-pled factual allegations in Plaintiff's Second Amended Complaint [ECF No. 20] (the "**Complaint**") and the counterclaim portions of Defendant's Answer to Second Amended Complaint and Counterclaim [ECF No. 21] (the "**Answer**"), but it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may consider "any written instrument attached to [the Complaint and Answer] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the Complaint and Answer, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effects.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). The Court also may take judicial notice of public filings on its own docket. *See In re 305 E. 61st St. Grp. LLC*, 644 B.R. 75, 80 n.6 (Bankr. S.D.N.Y. 2022).

3

## II.   **Factual Background Pertinent to the Motion**

On April 1, 2014, Debtor SunEdison Products Singapore Pte. Ltd. ("**SPS**") and Defendant entered into a "Solar Cell Purchase Agreement" (the "**SCPA**"), pursuant to which SPS would place orders to purchase solar cells from Defendant, and Defendant would invoice SPS once the order was completed.  [*See, e.g.*, ECF No. 20 at 7; ECF No. 21 at 14; ECF No. 23 at 4–5].  SPS also sold "wafers"—a type of raw material used in the manufacture of solar cells—to Defendant, which Defendant would use to manufacture the solar cells which SPS had ordered.  [*See, e.g.*, ECF No. 20 at 7; ECF No. 21 at 14–15; ECF No. 23 at 5].  Defendant alleges that it and SPS agreed "that the sale of wafers and solar cells [would] be a back-to-back integrated transaction" pursuant to which Defendant would "pay for the wafers at a fixed, inflated per-wafer price, and SPS agreed to pay for the solar cells at a price level reflecting the fixed, inflated wafer price and [an] agreed upon conversion fee (known as the 'tolling fee')."  [*See, e.g.*, ECF No. 21 at 15].  "Thus," Defendant alleges, "SPS never requested payment *in cash* for the wafers, but instead, SPS and Shinsung would *always* set off the amount owed to each other at a certain time interval.  SPS set off its payables to Shinsung with its receivables from Shinsung at the same amount and such payment terms were expressly memorialized in writing at Article 5.2 of the SCPA."  [*Id.*].  Because "the price of wafers was set off between Shinsung and SPS," Defendant's "profits were generated solely from the tolling fee."  [*Id.*].

On March 12, 2015, at the request of SPS, Defendant and SPS allegedly entered into an amendment to the SCPA which increased the number of solar cells which Defendant was to sell to SPS and which imposed "binding purchase commitments" on SPS.  [*Id*. at 15–16].  The increased solar cell demand exceeded Defendant's manufacturing capacity, so Defendant raised capital to expand its manufacturing facilities.  [*Id*. at 16].  According to Defendant, "[a]s part of

4

integrated transactions, Shinsung and SPS executed netting agreements to offset outstanding invoices." [*Id.* at 17].

On December 28, 2015, SPS allegedly sent a letter to Defendant stating that SPS expected "some delays in the planned schedule of payment" and committed to pay $5,500,000.00 by January 21, 2016 and $1,486,948.59 by January 28, 2016. [*Id.* at 17–18].

Plaintiff alleges that, on January 22, 2016, SPS transferred $5,476,728.92 from a line of credit to Defendant to pay off thirteen of the then-outstanding invoices (the "**January 22 Transfer**"). [ECF No. 20 at 7]. According to Plaintiff, immediately after the January 22 Transfer, Defendant owed SPS $26,905,196.00, and SPS owed Defendant $37,841,479.00, meaning SPS owed Defendant a net total of $10,936,283, which Plaintiff alleges constituted an "insufficiency" as defined in the Bankruptcy Code (the "**Insufficiency**"). [*Id.* at 7–8].

In January 2016, SPS allegedly stopped issuing purchase orders for solar cells (except for one small order in April 2016). [ECF No. 21 at 18]. Defendant alleges that this constituted a breach of the amended SCPA and that said breach caused Defendant to incur lost profits of $37,101,300 and additional costs of $9,853,500 to "dismantle the expanded manufacturing facilities designed specifically for SPS," for total damages of $46,954,800. [*Id.* at 18–19]. Despite SPS's alleged breach, Defendant "continued to purchase wafers from SPS up until March 2016." [*Id.* at 18].

On February 19, 2016, March 31, 2016, and April 4, 2016, SPS and Defendant allegedly entered into three netting agreements which, in the aggregate, "satisfied 99 of [Defendant's outstanding] invoices to SPS, totaling $37,869,918, through setoff" (the "**2016 Netting Agreements**"). [ECF No. 20 at 8]. SPS also allegedly issued two "credit memos" to Defendant which "reduc[ed] SPS's remaining claim against Shinsung to $5,430,403" on April 7, 2016. [*Id.* at 9].

5

SPS filed for bankruptcy on April 21, 2016 (the "**Petition Date**"), which was less than 90 days after the January 22 Transfer and the 2016 Netting Agreements.  [*See* Main ECF No. 1]. According to Plaintiff, as of the Petition Date, "Shinsung owed SPS $5,430,403 in due and payable invoices while SPS did not owe Shinsung anything."  [ECF No. 20 at 9].

On May 2, 2016, Defendant allegedly delivered a "notice of termination of the SCPA" to SPS, which SPS did not dispute.  [ECF No. 21 at 21].   "Six months [later]," SPS allegedly "demanded that Shinsung turn over $5,441,143.97 that SPS was owed as of the Petition Date for wafers Shinsung had purchased from SPS prior to the Petition Date."  [*Id*. at 22–23].  Because of certain proceedings in a Korean court, however, Defendant "was permitted to pay SPS only" $921,896.78.  [*Id.* at 23].

On March 22, 2017, Defendant and SPS allegedly "entered into a Set-Off Agreement . . . pursuant to which Shinsung and SPS set-off" $28,613.70 (which SPS allegedly owed to Defendant on unpaid prepetition invoices) against the $921,896.78 which Defendant was permitted to pay SPS, meaning Defendant was to pay SPS $893,283.08.  [*Id.* at 23].  Defendant allegedly made that payment on April 4, 2017 (the "**Setoff Payment**").  [*Id.*].

On July 28, 2017, the Court entered an order (the "**Confirmation Order**") confirming the Debtors' Second Amended Plan of Reorganization (the "**Plan**").  [Main ECF No. 3735].

In December 2017, following additional developments in the Korean court proceedings and pursuant to a related agreement between Defendant, SPS, and a third-party, Defendant allegedly paid $375,000 to the third-party and $4,144,247.19 to SPS, totaling $4,519,247.19 (the "**December 2017 Payments**").  [ECF No. 21 at 23–24].  The December 2017 Payments, together with the Setoff Payment, satisfied Shinsung's alleged $5,441,143.97 demand.  Thus, according to Defendant, after these payments were made, "SPS[']s and Shinsung's relationship was fully and finally settled by December 2017."  [*Id*. at 24].

6

On April 18, 2018, Plaintiff initiated this adversary proceeding.  [ECF No. 1].  According to the currently operative Complaint, filed on February 8, 2023, Plaintiff (a) asserts a preference claim under 11 U.S.C. § 547 to recover the $5,476,728.92 January 22 Transfer; (b) asserts a preferential setoff claim under 11 U.S.C. § 553(b) to recover the $10,936,283 Insufficiency, which the 2016 Netting Agreements allegedly eliminated by setting off $37,869,918 against the amount Defendant owed SPS; and (c) seeks to disallow any claims which Defendant may assert against the Debtors.  [ECF No. 20 at 10–13].

In the currently operative Answer, filed on April 10, 2023, Defendant raises nineteen affirmative defenses and two counterclaims.  [ECF No. 21 at 8–11, 27–35].  The First Counterclaim seeks a declaration that "the 'safe harbor' provisions of the Bankruptcy Code prohibit the Trustee from recovering under 11 U.S.C. §§ 547 and 553(b)(1)," and the Second Counterclaim seeks an order "authorizing Shinsung to setoff or recoup $52,395,943.97, the total amount of its damages claims ($46,954,800) and the [Setoff Payment] and [December 2017 Payments] ([totaling] $5,441,143.97), against any amounts the Court may find that Shinsung owes Plaintiff."  [*Id.* at 32, 36].  Relatedly, Defendant's Second Affirmative Defense argues that "Plaintiff's claims are barred, in whole or in part, by the doctrines of . . . setoff and/or recoupment," among others.  [*Id.* at 8].

On June 30, 2023, Plaintiff filed the present Motion to dismiss both counterclaims and strike the Second Affirmative Defense to the extent it relies on setoff and/or recoupment.  [ECF No. 23].  Defendant filed its response (the "**Response**") on September 8, 2023 [ECF No. 25], and Plaintiff filed a reply (the "**Reply**") on September 22, 2023 [ECF No. 26].  The Court heard oral argument on the Motion on September 28, 2023 (the "**Hearing**"), and the transcript is docketed at ECF No. 32.

## DISCUSSION

### III.    Legal Standards

#### A.    Rule 12(b)(6)

Rule 12(b)(6) provides that "a party may assert the following defense[] by motion: . . . failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion tests the sufficiency of the allegations in support of a complaint in light of the pleading requirements in Rule 8 of the Federal Rules of Civil Procedure." *In re Extended Stay, Inc.*, Case No. 09-13764, 2020 WL 10762310, at *5 (Bankr. S.D.N.Y. Aug. 8, 2020). To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court accepts the complaint's factual allegations as true and must draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of a cause of action will not do.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. (quoting Fed. R. Civ. Proc. 8(a)(2)). "To be plausible, the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere

possibility of a right to relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 556).

On a motion to dismiss pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322. A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Am. Tel. & Tel. Co.*, 62 F.3d at 72 (per curiam)).

B.    Rule 12(f)

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike an affirmative defense are generally disfavored, and 'will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'" *Sec. & Exch. Comm'n v. Honig*, No. 18 CIV. 8175 (ER), 2021 WL 5630804, at *4 (S.D.N.Y. Nov. 30, 2021) (citation omitted) (quoting *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), *vacated and remanded on other grounds*, 478 U.S. 1015 (1986)). Even so, "[f]ederal courts have discretion in deciding whether to strike an affirmative defense." *Id.* at *4 n.5 (citing *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir. 2019)).

"To succeed on a motion to strike an affirmative defense, a party must 'show that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense.'" *State St. Glob. Advisors Tr. Co. v. Visbal*, 462 F. Supp. 3d 435, 438 (S.D.N.Y. 2020) (quoting *GEOMC*, 918 F.3d at 96).

As to the first factor, "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense, but with recognition that, as the Supreme Court explained in *Iqbal*, applying the plausibility standard to any pleading is a 'context-specific' task." *GEOMC*, 918 F.3d at 98 (quoting *Iqbal*, 566 U.S. at 679). As to the second factor, "an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *Id*. Thus, "[i]n considering the first and second prongs, courts apply the same legal standards as applicable on a Rule 12(b)(6) motion to dismiss." *Wild Bunch, SA v. Vendian Ent., LLC*, No. 17 CIV. 1383, 2018 WL 1365690, at *2 (S.D.N.Y. Feb. 26, 2018).

As to the third factor, courts may consider, "*inter alia*, the 'burden of additional discovery' or the increased 'duration and expense of litigation.'" *Wild Bunch*, 2018 WL 1365690, at *2 (quoting *Tradewinds Airlines, Inc. v. Soros*, No. 08 CIV. 5901 JFK, 2013 WL 6669422, at *2 (S.D.N.Y. Dec. 17, 2013)).

## IV.    <u>The Motion Is Denied as to Defendant's First Counterclaim</u>

Defendant's First Counterclaim seeks a declaratory judgment that the "safe harbor" provisions of 11 U.S.C. §§ 547 and 553(b)(1) bar Plaintiff's claims against Defendant. [ECF No. 21 at 32]. Plaintiff argues that this counterclaim should be dismissed because, "[a]s confirmed by established case law, the Bankruptcy Code 'safe harbor' is a quintessential affirmative defense[,] . . . . not a counterclaim," and because, indeed, five of Defendant's affirmative defenses are based on the "safe harbor." [ECF No. 23 at 10, 12]. Defendant's Response, however, cites case law that it characterizes as "permit[ing] counterclaims for declaratory judgment that were allegedly duplicative of certain affirmative defenses" [ECF No. 25 at 4–5 (citing *In re Murray Energy Holdings Co.*, 637 B.R. 820, 824 (Bankr. S.D. Ohio 2022); other citations omitted)], and Plaintiff's Reply states that, "so as not to burden the Court," Plaintiff is "amenable to withdrawing its Motion

as to" the First Counterclaim "to the extent the Court believes it appropriate and useful to entertain Defendant's 'safe harbor' defense as both an affirmative defense and counterclaim at this juncture." [ECF No. 26 at 2]. During the Hearing, the Court acknowledged Plaintiff's offer to withdraw this portion of its Motion and remarked that the Court was inclined to allow the First Counterclaim to proceed in light of the authority Defendant identified and in light of the lack of any apparent harmful impact on case management if the counterclaim remains in place for the time being. Plaintiff's counsel did not object or voice any concerns to this approach. [ECF No. 32 at 21:4–18]. The Court concludes that identical discovery will be required whether the safe-harbor counterclaim is or is not dismissed, and the efficient resolution of the case may be furthered and will not be impaired by leaving the counterclaim in place, at least at this early stage in the proceedings. Thus, to the extent Plaintiff has not expressly withdrawn its Motion to the extent it seeks to dismiss Defendant's First Counterclaim, the Motion is hereby denied to that extent. This dismissal is without prejudice to renewal of contentions the counterclaim is legally insufficient in possible future motions, likely at the close of discovery.

**V.     The Motion Is Granted as to Defendant's Second Counterclaim**

Defendant's Second Counterclaim seeks to reduce any recovery to which Plaintiff may be entitled in accordance with the doctrines of setoff and recoupment. [ECF No. 21 at 33–35]. Similarly, Defendant's Second Affirmative Defense argues, in relevant part, that "Plaintiff's claims are barred, in whole or in part, by the doctrines of . . . setoff and/or recoupment." [*Id.* at 8]. In its Motion, Plaintiff argues that the Second Counterclaim should be dismissed, and the Second Affirmative Defense stricken in part, "for two independent reasons: (a) [they are] barred by the Plan and Confirmation Order, and (b) [they are] prohibited by section 553(a) of the Bankruptcy Code." [ECF No. 23 at 2]. For the reasons discussed below, the Court agrees that the Plan and Confirmation Order bar Defendant's Second Counterclaim. The Court further concludes that 11

U.S.C. § 553(a) independently bars Defendant's setoff-based counterclaim but not its recoupment-based counterclaim.

A.    <u>The Plan and Confirmation Order Preclude Defendant's Reliance on the Doctrines of Setoff and Recoupment</u>

1.    *Sections 10.12 and 11.12 of the Plan Preclude Defendant's Reliance on the Doctrines of Setoff and Recoupment*

Plaintiff argues that, "by their plain terms, sections 10.12 and 11.12 of the Plan preclude Defendant's asserted setoff and/or recoupment rights." [ECF No. 23 at 12].

The Plan was confirmed on July 28, 2017 by entry of a Confirmation Order that provides that "[t]he terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order and the Debtors are authorized to implement their provisions and consummate the Plan without any further authorization," that "[t]he provisions of this Confirmation Order and the provisions of the Plan are hereby deemed nonseverable and mutually dependent," and that "[t]he provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each," [Main ECF No. 3735 at 25 of 342, 39 of 342]. The Plan, in turn, provides that it "shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan." [*Id.* at 132 of 342].

Plan Section 10.12 bars "Holder[s] of Claims" from seeking setoff "against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors" absent certain exceptions not applicable here:

> **10.12   Setoffs.** . . . In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

12

[*Id.* at 131 of 342].  Similarly, Section 11.12 bars "Holders of Claims or Interests" from seeking recoupment of "any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors" absent certain exceptions not applicable here:

> **11.12  Recoupment.**  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

[*Id.* at 139–40 of 342].

Plaintiff argues that "through its Answer, Defendant is attempting to assert, for the first time, setoff and/or recoupment rights with respect to a purported unliquidated, contingent and disputed prepetition claim, asserting over $46 million in damages, based on SPS's alleged breach of the SCPA," even though "Defendant has had numerous opportunities to assert [those] rights." [ECF No. 23 at 13].  Thus, because Defendant did not "file[] a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date" or "perform[] such recoupment and provide[] notice thereof in writing to the Debtors on or before the Effective Date," as required by Plan Sections 10.12 and 11.12, respectively, those sections bar Defendant's Second Counterclaim here.  [*Id.* at 13–14].

In its Response, Defendant does not dispute that the confirmed Plan bars asserting setoff or recoupment rights in some situations.  Defendant instead argues that Sections 10.12 and 11.12, by their terms, bar setoff/recoupment only against "*Cause[s] of Action of the Debtors or the Reorganized Debtors*," which, Defendant argues, Plaintiff's claims are not.  [ECF No. 25 at 7–8]. According to Defendant, because Plaintiff's claims are "part of the GUC/Litigation Trust assets," they are causes of action of *Plaintiff*, not the Debtors or the Reorganized Debtors, and "neither

Section 10.12 nor Section 11.12 of the Plan have any bearing here." [*Id.*]. In its Reply, Plaintiff counters that its claims are "Causes of Action of the Debtors" which were merely "transferred [from the Debtors] to the Trust pursuant to the Plan and Confirmation Order," and "Defendant's contention that Plan sections 10.12 and 11.12 cease to apply to 'Cause[s] of Action of the Debtors' once they have change[d] hands from the Debtors to the Trust is [] unsupported and contrary to the Plan's plain language and meaning." [ECF No. 26 at 2–3]. Anticipating Plaintiff's argument, Defendant argues, in a footnote within its Response, that "upon transfer of causes of action to the GUC/Litigation Trust it ceased to be [a Cause of Action of the Debtors]. Sections 10.12 and 11.12 concern claims for setoff or recoupment that would affect the Debtors or the Reorganized Debtors—*e.g.*, parties making claims that the Debtors or the Reorganized Debtors would have to pay . . . . [not] an entirely defensive setoff held against a party other than a Debtor or a Reorganized Debtor." [ECF No. 25 at 7 n.3]. The crux of the dispute, therefore, is whether Plaintiff's claims are "Causes of Action of the Debtors."

The Plan does not explicitly define the term "Cause of Action of the Debtors," but it does provide the following relevant definitions:

- "**Causes of Action**" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable, in contract or in tort, directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by any Debtor, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights . . . , and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date [Main ECF No. 3735 at 56–57 of 342];

14

- "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and their recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under section 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code [*id.* at 55 of 342];

- "**Debtors**" is defined as, collectively, "SunEdison, Inc. . . . and certain of its affiliates [listed in the Plan but omitted here to save space], the debtors and debtors in possession" [*id.* at 50 of 342]; and

- "**Reorganized Debtors**" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date" [*id.* at 76 of 342].

Plaintiff's claims plainly are "Causes of Action" as that term is defined, and Plaintiff, a litigation trust created pursuant to the Plan, plainly is *not* one of the "Debtors" or the "Reorganized Debtors" as those terms are defined, so the critical question is whether the Plaintiff's claims— which indisputably originally belonged to the Debtors and were transferred to Plaintiff pursuant to the Plan—remain "Causes of Action of the Debtors" even following that transfer.  Having reviewed the relevant provisions of the Plan, relevant provisions of the Bankruptcy Code, and relevant case law, the Court concludes that the Plaintiff's claims do remain "Causes of Action of the Debtors."  Because there is no plausible contrary reading of the relevant documents, the Court grants the Motion insofar as it seeks dismissal of the Second Counterclaim.

First, the confirmed Plan itself defines "GUC/Litigation Trust Causes of Action"—which include Plaintiff's claims here—as "all Causes of Action *of the Debtors' Estates* as of the Effective Date."  [*Id.* at 66 of 342 (emphasis added)].  "Estates," in turn, is defined in the Plan as "the bankruptcy estates *of the Debtors* created pursuant to section 541 of the Bankruptcy Code" [*id.* at 62 of 342 (emphasis added)], and Code Section 541 provides that the "estate is comprised of all the following property, wherever located *and by whomever held*: . . . all legal or equitable interests *of the debtor* in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis

15

added).  Thus, by definition, Plaintiff's claims are legal or equitable interests *of the Debtors*,

regardless of who holds them.  This, alone, confirms that Plaintiff's claims are Causes of Action

of the Debtor, but it is not the only basis for that conclusion.

The Plan and the exhibits thereto distinguish between causes of action "of" a party, and

causes of action "brought by" or "asserted by" that party.  For example, as the preceding discussion

makes clear, several Plan provisions and exhibits—including most, if not all, of the provisions

discussing the very claims at issue here—use the broader term "of" that is used in Sections 10.12

and 11.12.  [*See, e.g.*, Main ECF No. 3735 at 66 of 342 ("'GUC/Litigation Trust Causes of Action'

means all Causes of Action *of* the Debtors' Estates as of the Effective Date") (emphasis added),

216 of 342 (same), 267 of 342 (same), 221 of 342 (assigning to the Litigation Trust "all Causes of

Action *of* the Debtors' Estates as of the Effective Date") (emphasis added)].  By contrast, as stated

above, Section 1.25 of the Plan defines "Avoidance Actions" as referring to certain "actual or

potential claims and causes of action . . . that may be *brought by and on behalf of* the Debtors and

their estates" [*id.* at 55 of 342] (emphasis added), and several other provisions of the Plan and its

exhibits use similar language [*see, e.g., id.* at 67 of 342 ("a Claim or a Cause of Action *by* SUNE

or any direct or indirect subsidiary of SUNE against Sune or any direct or indirect subsidiary of

SUNE, in each case other than (i) any Claim or Cause of Action *by* or against any YieldCo, (ii)

any Claim or Cause of Action *by* a non-Debtor against another non-Debtor, and (iii) any Claim or

Cause of Action *by* a Debtor against a non-Debtor"), 81 of 342 ("the claim *by* Woongjin Energy

Co. Ltd. [] against Debtor") (emphasis added), 107 of 342 ("claim[s] against any of the Estates

*asserted by* a creditor which remains in possession of, or otherwise obtains the benefit of, the

avoidable transfer), 112 of 342 ("Disputed General Unsecured Claims *asserted by* Vivint Solar,

Inc.") (emphasis added), 136 of 342 ("any liabilities *asserted by* the United States or any

Governmental Unit" and "any legal action or claim *brought by* the SEC") (emphasis added), 243

of 342 ("any claims *asserted by* Convertible Senior Noteholder or any other party") (emphasis

added), 244 of 342 ("any Disputed General Unsecured Claims *asserted by* Vivint Solar, Inc.")

(emphasis added).

Indeed, during the Hearing, when the Court asked Defendant's counsel to address the

distinction between the use of the word "of" in Sections 10.12 and 11.12 of the Plan and the use

of the words "asserted by or on behalf of" in Paragraph 34 of the Confirmation Order (on which

Defendant relies), counsel's response failed to address the distinction in any meaningful way.

[ECF No. 32 at 36:25–38:12 (The Court: "I think you're going to tell me [Plaintiff is] just slicing

it too fine.  But let me hear your response to [Plaintiff's] effort to square the language."  Counsel:

"That's right.  .  .  .  And there's some inconsistency there.  Right.  So they want to have it both

ways.  I think verb is important.  'Asserted' on behalf of the debtors.  I think that's just how it

flows.")].  This failure is particularly telling in light of the fact that Defendant, elsewhere in its

Response brief, specifically argues that parties should not "ignore[] that there are two different

terms used," that "all words must be given meaning," and that "[i]f parties to a contract omit

terms—particularly, terms that are readily found in other, similar contracts—the inescapable

conclusion that the parties intended the omission."  [ECF No. 25 at 9–10] (citation omitted).

With all of this in mind, considering that Sections 10.12 and 11.12 are among the

provisions that use the broader term "of" instead of the more limited language used elsewhere in

the Plan, it would be inappropriate to read such limited language into Sections 10.12 and 11.12

and impose a restriction that the Plan did not specify.

Moreover, the Court's own research identified limited but persuasive case law supporting

this conclusion, although the parties' briefs do not cite any law on this issue, and when asked

during the Hearing, neither Plaintiff nor Defendant identified any such law.  [ECF No. 32 at 26:1–

27:4].

17

In *In re Premium Escrow Services, Inc.*, the U.S. Bankruptcy Court for the District of Columbia considered whether it had post-confirmation subject matter jurisdiction over certain claims that had been assigned to the plaintiff by the debtor. 342 B.R. 390, 393–94 (Bankr. D.D.C. 2006). The *Premium Escrow* court explained that 11 U.S.C. § 1123, which governs Chapter 11 plans, "permits a court to retain jurisdiction pursuant to the terms of a plan whenever the court appoints a representative to enforce the 'claim[s] or interest[s]' of the debtor's estate. A debtor's estate is 'comprised' of, *inter alia*, 'all legal or equitable interests of the debtor in property as of the commencement of the case.' 11 U.S.C. § 541(a). So long as the plan expressly vests a court-appointed entity with estate property under the court's oversight, that property remains the debtor's 'estate' for purposes of 28 U.S.C. § 1334[, which governs Bankruptcy Courts' jurisdiction]." *Id.* at 399 (alterations in original). The *Premium Escrow* court then distinguished that situation from one in which "a litigation trust prosecutes a cause of action that did not belong to the debtor or the debtor's estate prior to confirmation," in which case "that cause of action belongs to the litigation trust personally rather than in its capacity as representative of the debtor's estate." *Id.*

The District Court in this District has relied on *Premium Escrow*'s reasoning. In *Krys v. Sugrue*, the Court found that, for purposes of determining whether the Bankruptcy Court had post-confirmation jurisdiction over certain claims asserted by a litigation trust, there existed a "close nexus" between the claims and the bankruptcy "because the [Litigation] Trust itself is a creation of the [Bankruptcy] Plan. The claims being asserted do not 'belong[] to the litigation trust personally,' but rather, are precisely those causes of action that were transferred by the [] Debtors to the [Litigation] Trust pursuant to the [Bankruptcy] Plan." 2008 WL 4700920, at * 6 (S.D.N.Y. Oct. 23, 2008) (quoting *Premium Escrow*, 342 B.R. at 399). Based on this line of cases, then, whether a cause of action is considered a cause of action *of the Debtors* does not depend on who brings or enforces the cause of action, but, instead, on whether the cause of action belonged to the

18

debtors in the first place, and whether the cause of action was transferred pursuant to a confirmed plan, both of which are the case here.  And although the issue before the Court here is not one of jurisdiction, the Court sees no reason why the same reasoning would not apply in this case.  On the contrary, the reasoning of *Premium Escrow* and *Krys* comports with both the Bankruptcy Code and the Plan here.

This understanding finds support in Section 1123(b)(3) of the Bankruptcy Code, which provides that a plan may "provide for (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement *by the debtor, by the trustee, or by a representative of the estate appointed for such purpose*, of any such claim or interest."  11 U.S.C. 1123(b)(3) (emphasis added).  Thus, by its plain terms, § 1123(b)(3) contemplates that "claim[s] or interest[s] belonging to the debtor or to the estate" may be "ret[ained] and enforce[d] by the debtor, by the trustee, or by a representative of the estate appointed for such purpose"—such as, for example, a litigation trust.  *See, e.g.*, *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 719 (Bankr. D. Md. 2005) ("Here, the Plan specifically creates the Litigation Trust to hold, and through the Litigation Trustee, to prosecute the Litigation Trust Claims, the recoveries from which are to pay the Unsecured Claims in Class 9.  Consequently, the Litigation Trustee represents the estate by assuming the obligations to prosecute the instant claims for the benefit of unsecured creditors.  Both tests are satisfied to establish standing under 11 U.S.C. § 1123(b)(3).") (cited with approval in *Premium Escrow*, 342 B.R. at 398–400).  It would make no sense, then, if "any claim or interest belonging to the debtor or to the estate" ceased to be so simply because the estate's confirmed plan called for the claim to be enforced by "a representative of the estate appointed for such purpose."

Therefore, the Court holds that Plaintiff's claims unambiguously are "Causes of Action of the Debtors" as that phrase is used in Plan Sections 10.12 and 11.12, and that, therefore, those Sections apply and require dismissal under Rule 12(b)(6) of Defendant's Second Counterclaim.

    2.    *Paragraph 34 of the Confirmation Order Does Not Salvage Defendant's Second Counterclaim*

Defendant argues that, even if Sections 10.12 and 11.12 preclude the Second Counterclaim by their own terms, the counterclaim is nonetheless preserved by Paragraph 34 of the Confirmation Order.  [ECF No. 25 at 8–10].  Paragraph 34 provides:

> Notwithstanding anything to the contrary in this Order, the Plan, or any Plan Supplement, nothing in the schedule of Retained Causes of Action (Exhibit 6.20 of the Plan Supplement) [Docket No. 3522] shall preclude an[y] party from asserting any available defense to any retained cause of action asserted by or on behalf of the Debtors.

[Main ECF No. 3735 at 40 of 342].  Thus, according to Defendant, "whether intended or not, . . . [i]nasmuch as Sections 10.12 or 11.12 apply here, the 'notwithstanding anything to the contrary in the Plan' language in Paragraph 34 of the Confirmation Order obviates them."  [ECF No. 25 at 13].  The plain language of Paragraph 34 makes clear, however, that Defendant's reading is not plausible, and that Defendant's desired result was not intended by the Court when it entered the Confirmation Order.

Paragraph 34 begins "[n]otwithstanding anything to the contrary in . . . the Plan," and Defendant's position entails mistakenly overreading Paragraph 34 to say, in essence, that even if the Plan says otherwise, all defenses to all retained causes of action are preserved in all cases.  But this interpretation not only has the absurd effect of nullifying several Court-approved Plan provisions—such as, for example, Sections 10.12 and 11.12—but also is flatly contradicted by the language of Paragraph 34 itself.  As just noted, Paragraph 34 provides that, "[n]otwithstanding anything to the contrary in . . . the Plan . . . , *nothing in the schedule of Retained Causes of Action*

(Exhibit 6.20 of the Plan Supplement) [Docket No. 3522] shall preclude an[y] party from asserting

any available defense." [Main ECF No. 3735 at 40 of 342] (emphasis added). In other words,

Paragraph 34 merely says that Exhibit 6.20 of the Plan Supplement will not operate to preclude an

otherwise available defense, even if something in the Plan might suggest that Exhibit 6.20 should

so operate. But even a cursory reading of the preceding section of this Decision demonstrates that

Exhibit 6.20 is irrelevant to the discussion; it is Sections 10.12 and 11.12 of the Plan itself, and not

Exhibit 6.20 to the Plan Supplement, which operate to bar the Second Counterclaim. Nothing in

Paragraph 34 of the Confirmation Order can be read to defeat the protections of Plan Sections

10.12 and 11.12, which are not contained within "the schedule of Retained Causes of Action"

itself. Put another way, a separate provision saying that Exhibit 6.20 does not preclude asserting

available defenses does not, as a matter of plain meaning or logic, somehow abnegate the setoff-

and recoupment-preclusive effect of Sections 10.12 and 11.12. Indeed, Exhibit 6.20 is merely a

schedule of "Retained Causes of Action," which explicitly exclude the causes of action transferred

to the Trust including those at issue here. Those transferred causes of action are separately

scheduled at Exhibit 7.6 to the Plan. [See, e.g., ECF No. 23 at 20–22; Main ECF No. 3522 at 49–

50 of 138; Main ECF No. 3735 at 267–332 of 342]. Thus, Paragraph 34 has no impact on the

preclusive effect of Sections 10.12 and 11.12 here.

Much ink and argument time has also been expended arguing about the supposed

distinction between the capitalized term "Retained Causes of Action" and the lowercase term

"retained causes of action," both of which appear in Paragraph 34. [See ECF No. 25 at 9–10; ECF

No. 26 at 3–4; ECF No. 32 at 40:21–42:7]. In short, Defendant's position is that the defined term

"Retained Causes of Action" does not include causes of action transferred to the Trust, while the

undefined (and assertedly broader) term "retained causes of action" does. Thus, the argument

goes, because Paragraph 34 says that "nothing in the schedule of Retained Causes of Action

[capitalized] (Exhibit 6.20 of the Plan Supplement) [Docket No. 3522] shall preclude an[y] party from asserting any available defense to any *retained cause of action [lowercase]*," Paragraph 34 preserves all defenses not just to the Retained Causes of Action, but to *all* causes of action, including Plaintiff's claims here.  [*See, e.g.*, ECF No. 32 at 41:8–16].  This contention is both strained and beside the point.  As just discussed, Paragraph 34 does not save any defenses from the preclusive effect of Sections 10.12 and 11.12; it saves defenses from the preclusive effect, if any, that Exhibit 6.20 might otherwise have.  It makes no difference, then, whether the lowercase "retained cause[s] of action" include Plaintiff's claims here, because Sections 10.12 and 11.12 remain just as effective either way.  Further, and although unnecessary to its ruling, the Court still holds the view it expressed during the Hearing that it "seem[s] like a stretch to . . . read that lowercase 'any retained cause of action' . . . in the context [in which] it appears[,] to mean anything other than referencing the retained causes of action as defined by exhibit 6.2, which is explicitly referenced in the very same sentence."  [ECF No. 32 at 41:2–7].

Thus, Paragraph 34 of the Confirmation Order does not save Defendant's Second Counterclaim.  Because the Second Counterclaim is barred by operation of Sections 10.12 and 11.12 of the Plan, the Second Counterclaim is hereby dismissed.

B.    11 U.S.C. § 553(a) Bars the Setoff Counterclaim but Not the Recoupment Counterclaim

In addition to dismissing the Second Counterclaim as precluded by Plan Sections 10.12 and 11.12, the Court holds in the alternative that the portion of the Second Counterclaim that is based on asserted setoff defenses also fails to state a claim because 11 U.S.C. § 553(a) independently bars Defendant's setoff-based counterclaim.  This alternative holding does not reach Defendant's recoupment-based counterclaim, as explained below, because the pleadings allege an

integrated course of dealing for purposes of the recoupment doctrine that might make the recoupment counterclaim not susceptible to dismissal at the pleadings stage.

       1.     *Defendant's Setoff Claim Is Barred by Section 553(a)*

Section 553(a) provides that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a). "A setoff concerns a defendant reducing a plaintiff's claim against it by its claim against the plaintiff which arises out of a different transaction than the one upon which the plaintiff bas[e]s its claim." *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007). "Whether to allow a setoff is within the sound discretion of a bankruptcy court." *Id.* (citing *In re Bennett Funding Grp., Inc.*, 146 F.3d 136, 140 (2d Cir. 1998)).

In short, Plaintiff argues that Section 553(a) preserves only those setoff rights which meet certain requirements, including, critically, that both the debtor's debt to the creditor and the debtor's claim against the creditor arose pre-petition. [ECF No. 23 at 17–20 (citing *E. Airlines, Inc. v. Chem. Bank, Inc.*, No. 95 CIV. 3981, 1997 WL 282264, at *2 (S.D.N.Y. May 28, 1997); other citations omitted)]. Plaintiff concedes that the Defendant has alleged a pre-petition debt but argues that the claims against which Defendant seeks to offset the debt, which exist solely by operation of the bankruptcy code, necessarily arose *post*-petition. [*Id.* at 18–20 (citing *In re Enron Creditors Recovery Corp.*, 376 B.R. at 466; other citations omitted)]. Thus, Plaintiff argues, "Defendant is seeking to setoff its unliquidated, contingent, disputed and discharged prepetition claim (which, if it had been filed and 'allowed,' would only be entitled to a fractional recovery) against the Trust's post-petition preference claims to recover real dollars," which "is not allowed." [*Id.* at 19].

Defendant attempts to distinguish "the cases upon which the Trust relies"—without identifying which cases Defendant is referring to—on the basis that those cases "concern whether a pre-petition claim may be used to offset preference liability under Section 547 or fraudulent transfer liability under Section 548 or Section 544," not whether "rejection damages from the post-petition rejection of the contract may be used to offset an alleged 'improvement in position' under Section 553(b)." [ECF No. 25 at 11]. Though unclear, this appears to be Defendant's attempt to grapple with *Enron*, which held that "setoff [was] not proper" because, even though the debtor's obligation to the creditor "stem[med] from [a pre-petition contract] and [wa]s a pre-petition debt," the creditor's "obligation to return the preference result[ed] from the operation of the Bankruptcy Code, and ar[ose] upon the filing of the bankruptcy case," meaning that the creditor's "obligation to repay the preference [wa]s not a pre-petition debt." 376 B.R. at 466. Defendant's Response cites no law to rebut *Enron* or to otherwise support Defendant's position, and when asked during the Hearing, Defendant's counsel identified no such law. [ECF No. 32 at 52:14–53:19]. The Court sees no reason why the reasoning of *Enron* is any less applicable here; even if Defendant's alleged obligations arise from a different provision of the Bankruptcy Code, those obligations still "result[ed] from the operation of the Bankruptcy Code," they "ar[ose] upon the filing of the bankruptcy case," and they therefore are "not a pre-petition debt." *See* 376 B.R. at 467. Defendant's other arguments do not avert this conclusion.

Defendant asserts that its Second Counterclaim is for contract rejection damages, and courts have held that such claims are deemed to have arisen pre-petition and may be used "as part of a pre-petition setoff." [ECF No. 25 at 10–11 (citations omitted)]. But Plaintiff does not dispute that *Defendant's* claim allegedly arose pre-petition; instead, Plaintiff argues that its *own* claims arose *post*-petition, such that Defendant's *pre*-petition claim may not be set off against it.

Finally, Defendant argues that "the claim [here] is not contingent, even if the exact amount of damages may not be fully calculated," so Plaintiff's ancillary argument that a contingent claim may not be set off fails.  [*Id.* at 11].  Relatedly, Defendant asserts that Plaintiff's cases relating to that argument rely on New York and California state law, while "the contract at issue involves foreign law, specifically the United Nations Convention on Contracts for the International Sale of Goods and the law of Singapore," rendering New York and California state law "simply irrelevant" here. [*Id.* at 10–11].  These potentially thorny issues were not meaningfully developed in the briefing or during the Hearing, but because Plaintiff's other arguments against setoff are successful because one legally accrued pre-petition while the other accrued on or after the petition was filed, this Decision need not and does not resolve these issues.

Thus, even if the Plan did not bar Defendant's setoff counterclaim, the Court would exercise its "sound discretion" and dismiss the claim under Rule 12(b)(6) as barred by Section 553(a).  *Enron*, 376 B.R. at 465.

### 2.   *Section 553(a) Does Not Independently Warrant Dismissing Defendant's Recoupment Claim at the Pleadings Stage*

 "Recoupment is a process that permits a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim.  Recoupment is an equitable doctrine that is allowed on a limited basis in bankruptcy cases when both debts at issue arise out of a single integrated transaction."  *Enron*, 376 B.R. at 466 n.20 (citations and internal quotation marks omitted).  Defendant's recoupment counterclaim received less attention in the briefing and during the Hearing than its setoff counterclaim, but in short, invoking reasoning used in *Enron*, Plaintiff argues that it would be inequitable to allow Defendant to proceed on its recoupment claim because "Defendant failed to file a proof of claim with respect to its purported breach of contract claim,

25

which has since been waived, barred, and discharged under the Plan and Confirmation Order. Moreover, . . . the Plan expressly addressed the treatment of any alleged setoff and/or recoupment rights with respect to creditor claims and, unless properly preserved in accordance with the Plan, discharged them." [ECF No. 23 at 21]. Plaintiff also argues that contingent claims may not be recouped. [*Id.* at 21–22].

Defendant responds that "Section 553, which addresses setoff, has no effect on the equitable doctrine of recoupment," such that recoupment is not barred merely because one debt arose pre-petition and the other arose post-petition. [ECF No. 25 at 12 (citing *In re Bob Brest Buick, Inc.*, 136 B.R. 322, 323 (Bankr. D. Me. 1991))]. Case law confirms that, by its very nature, recoupment arises "when a party seeks to net prepetition and postpetition obligations," and that recoupment is unnecessary when all of the relevant obligations arose prepetition because setoff is available. *See, e.g.*, *In re Enron Corp.*, 349 B.R. 96, 107 (Bankr. S.D.N.Y. 2006). Thus, the relevant inquiry is whether equity compels dismissal of the recoupment counterclaim even though it is not barred by the claim's "straddling" the petition date. At this early stage of the case, the Court concludes that it does not.

Although Plaintiff is correct that *Enron* is analogous to this case, Defendant's counsel rightly noted during the Hearing that *Enron* was decided on a motion for summary judgment, not a motion to dismiss. [ECF No. 32 at 43:10–15]. The equitable considerations discussed in *Enron* may yet apply with equal force to this case and may yet compel rejection of Defendant's claims once the factual record is more fully developed, but the record has not been developed yet, and the facts alleged describe a thoroughly entwined and integrated course of commercial conduct. It is thus premature to hold that equity requires dismissal of Defendant's recoupment counterclaim even though, unlike its setoff claim, it is not *per se* barred as a matter of law. Thus, absent the

dispositive Plan provisions discussed above, the Court would not dismiss the recoupment counterclaim under Rule 12(b)(6) on the bases of Section 553(a) or equity.

## VI.   <u>The Motion Is Denied as to Defendant's Second Affirmative Defense</u>

The Court's analysis of the Second Counterclaim applies equally to that portion of the Second Affirmative Defense that relies on the doctrines of setoff and recoupment.  Thus, to the extent the defense relies on those doctrines, "there is no question of fact which might allow the defense to succeed," and "there is no question of law which might allow the defense to succeed." *GEOMC*, 918 F.3d at 96.  The inquiry does not end there, however, as the Court must also consider whether Plaintiff "would be prejudiced by inclusion of the defense."  *Id*.

Both Plaintiff's Motion and Defendant's Response acknowledge that prejudice to the plaintiff is the third prong of the three-factor test on a motion to strike [ECF No. 23 at 11; ECF No. 25 at 2], and the Motion also notes that "[w]hen considering the third prong, plaintiff may point to, *inter alia*, the 'burden of additional discovery' or the increased 'duration and expense of litigation.'"   [ECF No. 23 at 11] (quoting *Wild Bunch*, 2018 WL 1365690, at *2).   Beyond acknowledging that prejudice is a factor in deciding whether to strike an affirmative defense, however, neither party addressed the issue of prejudice in the motion papers or during the Hearing. [*See generally* ECF No. 23; ECF No. 25; ECF No. 26; ECF No. 32].

In light of Plaintiff's failure to make the required showing that it would suffer prejudice if the affirmative defense is not stricken, and because relief under Rule 12(f) is "disfavored," *Sec. & Exch. Comm'n v. Honig*, 2021 WL 5630804, at *4, the Court denies the motion to strike, without prejudice to renewal if Plaintiff wishes to cure the deficiency in its submission by showing that it will be prejudiced if the affirmative defense is not stricken.   As noted, the Court's decision regarding the sufficiency of the counterclaim pleadings regarding setoff and recoupment is likely fatal to the substantively identical affirmative defenses, and these holdings can be considered in

27

possible future contexts including decisions regarding the scope of discovery and motions for summary judgment and/or *in limine* prior to any eventual trial in this action.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Motion is **granted in part and denied in part.** Defendant may continue to pursue its First Counterclaim, but its Second Counterclaim is dismissed with prejudice.  The motion to strike the Second Affirmative Defense is denied.

It is so ordered.


Dated: New York, New York
      October 24, 2023

                                      *s/ David S. Jones*
                                  Honorable David S. Jones
                                  United States Bankruptcy Judge